**In re Frank GRIGOLI, Debtor.**

**Bankruptcy No. 190–13349–260.**

United States Bankruptcy Court,
E.D. New York.

March 9, 1993.

Daniel A. Zimmerman, New York City, for debtor.

Mudge Rose Guthrie Alexander & Ferdon, by John L. Altieri, Jr., Ralph P. De-Santo, New York City, for Citibank, N.A.

Boyle, Vogeler & Haimes, by Michael J. Levin, New York City, for Miltreal I and IV.

Jacoby & Meyers by Gregory Messer, Brooklyn, NY, for trustee.

U.S. Atty. by Patricia C. Henry, Brooklyn, NY, for the U.S. and its agency, the I.R.S.

## DECISION ON MOTION SEEKING TO DISMISS THE INVOLUNTARY PETITION, OR, ALTERNATIVELY, TO LIFT THE AUTOMATIC STAY

CONRAD B. DUBERSTEIN, Chief Judge.

This matter comes before the Court on the motion of Citibank, N.A. ("Citibank") for an order, pursuant to 11 U.S.C. § 305(a), dismissing the involuntary petition for relief under Chapter 7 of the Bankruptcy Code filed against the Debtor, Frank Grigoli, ("Grigoli" or the "Debtor") by two general partnerships, Miltreal I and IV, (collectively, "Miltreal") or, alternatively, for an order lifting the automatic stay pursuant to 11 U.S.C. § 362(d), so as to allow Citibank to enforce its judgment lien affecting certain funds of the Debtor presently held in escrow and directing the same to be paid to Citibank. For the reasons hereinafter set forth, the motion is denied in its entirety.

### FACTS

The Debtor is a founding general partner and limited partner of Parkway Central Associates ("Parkway"), a Texas real estate limited partnership. In exchange for limited partnership interests, the Debtor and his partners executed promissory notes (the "Notes") in favor of Parkway, which were secured by a portfolio of Federal National Mortgage Association ("FNMA") securities. The notes were then assigned to Citibank, with the FNMA securities taken as collateral, in exchange for a loan from Citibank to Parkway. Parkway then turned over the proceeds of the loan to the Debtor and his partners. Under the then existing tax laws, the proceeds received by the Debtor and his partners did not consti-

tute current income, thus giving them the benefit of the income without a current tax obligation. Inasmuch as the securities remained in Parkway's possession, it received the income generated therefrom which it in turn paid over to Citibank and which was usually sufficient to cover the Citibank obligation. Subsequent to the execution and delivery of the notes, Parkway filed a petition for relief under Chapter 11 of the Bankruptcy Code on January 19, 1988, in the Northern District of Texas, which case has since been closed.

The income from the FNMA securities eventually became inadequate to cover the interest obligation on the Citibank loan and Parkway defaulted on the notes. Upon default, Citibank commenced an action in the New York State Supreme Court, New York County, against the Debtor and his partners, to collect payment on the notes and was granted summary judgment in its favor in the sum of $487,298.22, representing the outstanding balance of the notes plus interest. Subsequently, Citibank foreclosed on the FNMA securities, thereby creating a significant, but phantom, taxable gain for the Debtor. The Debtor filed his State and Federal income tax returns for the 1990 taxable year acknowledging, but not paying, the tax liability. Thereafter, both the New York State Department of Taxation and Finance and the Internal Revenue Service (the "I.R.S.") assessed the tax due and proceeded to obtain tax liens against the Debtor. Debtor's counsel then commenced negotiations with the taxing authorities.

On May 11, 1990, Citibank docketed its judgment against the Debtor in the offices of the County Clerks of New York and Kings County. The docketing of the judgment created a lien against all of the Debtor's real property located in the counties in which the judgment was docketed. *See* N.Y.Civ.Prac. L. & R. § 5203(a) (McKinney 1992). In addition, Citibank also had other significant, but unliquidated, claims against the Debtor.

Prior to the commencement of its Chapter 11 case, Parkway borrowed monies from Miltreal, the payment of which was

guaranteed by the Debtor. Miltreal is the Debtor's largest creditor with a claim in excess of $3.2 million.

Thereafter, the Debtor reached an agreement in principal with Citibank settling all the bank's outstanding claims for $250,-000.00. By letter dated July 9, 1990, the Debtor proposed to fund the settlement by selling certain real property owned by him and his wife, Jeanette Grigoli. As a condition of the settlement, Citibank was to obtain a release by Miltreal of all its claims against the Debtor. Miltreal agreed to provide a release to the Debtor in return for (1) the Debtor's agreement to assign to Miltreal and Citibank certain contingent interests he owned and (2) Citibank's agreement to give Miltreal a share of its settlement proceeds.

The Debtor alleges that at the end of July, 1990, counsel for Miltreal indicated his intent to maintain the status quo while the parties finalized their settlement. This was to be accomplished by filing an involuntary petition in bankruptcy by Miltreal against the Debtor within ninety days from the date the aforesaid lien of Citibank was docketed, so that in the event the settlement was not consummated, the lien would be deemed preferential and void under § 547[1] and the amount of the preferential transfer would be recoverable by the Trustee under § 550(a).[2] The Debtor states that he notified counsel for Miltreal that he would file a voluntary petition for relief in bankruptcy if the involuntary petition was not so filed. On August 9, 1990, 89 days after Citibank docketed its judgment, Miltreal filed an involuntary petition for relief against the Debtor under Chapter 7 of the Bankruptcy Code.

On December 18, 1990, the Debtor filed an answer to the involuntary petition contesting entry of an Order for Relief. Meanwhile, direct negotiations continued between Miltreal's counsel and the Debtor's counsel concerning the form of the release that Miltreal would provide as called for by the settlement.

At the time of the commencement of this case, the Debtor and his wife owned as tenants by the entirety, two multi-family residential properties located in the County of Kings at 1520 64th Street and 1437 80th Street, Brooklyn, New York. Citibank, Miltreal and the Debtor consented to an order of this Court, entered on March 4, 1991, in accordance with the provisions of § 303(f)[3] which would (1) permit the Debtor to exchange his one-half interest in the 80th Street property with his wife's one-half interest in the 64th Street property so that the Debtor would acquire 100% ownership of the 64th Street property, (2) authorize the Debtor to sell the 64th Street property free and clear of Citibank's judgment lien, and (3) transfer Citibank's lien to the cash proceeds of the sale, to be held in escrow by Citibank in the form of Certificates of Deposit, subject to Citibank's judgment lien in accordance with § 363(f)(2).[4] Citibank argues that it and Miltreal both consented to the order based on the express representation by the Debtor's counsel that the Debtor had agreed to settle, subject only to obtaining a satisfactory release from Miltreal and the dismissal of the bankruptcy case on the merits arising out of the Debtor's answer to the involuntary

---

**1.** *See infra* p. 321.

**2.** Section 550(a) of the Bankruptcy Code states in pertinent part:

   Except as otherwise provided in this section, to the extent that a transfer is avoided under section ... 547, ... the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
   (1) the initial transferee....

**3.** Section 303(f) of the Bankruptcy Code states:
   Notwithstanding section 363 of this title, except to the extent that the court orders

otherwise, and until an order for relief in the case, any business of the debtor may continue to operate, and the debtor may continue to use, acquire, or dispose of property as if an involuntary case concerning the debtor had not been commenced.

**4.** Section 363(f)(2) of the Bankruptcy Code states in pertinent part:

   The trustee may sell property ... free and clear of any interest in such property of an entity other than the estate, only if—

   .     .     .     .     .

   (2) such entity consents....

petition, thus obviating the need for notice of dismissal to all the creditors. Citibank claims that absent this representation, it would not have consented to the entry of the order.

Subsequently, the Debtor sold the 64th Street property for $250,000. Pursuant to the March 4, 1991, order, the Debtor applied the $250,000 for the purchase of Certificates of Deposit from Citibank. Said order prohibits Citibank from distributing the proceeds except by order of this Court or the joint agreement of the Debtor, Citibank and Miltreal. Presently, the Certificates of Deposit remain with Citibank pending distribution.

Citibank alleges that throughout the remainder of 1991, the Debtor continued to represent to Miltreal and Citibank that he would sign a settlement agreement. A settlement closing was scheduled for the afternoon of December 23, 1991. On the morning of that day, Debtor's counsel advised Citibank that the Debtor did not intend to proceed with the settlement.

On March 26, 1992, the Court held a status conference to consider Citibank's request that this case be dismissed or, in the alternative, the funds held in escrow be paid to Citibank. At the conference, Debtor's counsel sought permission to withdraw his previously filed answer to the involuntary petition and to file a consent to the entry for an Order for Relief. At such time, the Court declined to enter an Order for Relief, and invited Citibank to make the present motion to dismiss.

On March 27, 1992, the Debtor filed a withdrawal of his answer to the involuntary petition and consented to the entry of an Order for Relief. Based upon the status conference of March 26, 1992, and the Debtor's consent, this Court entered an Order for Relief on March 30, 1992.

On July 10, 1992, Citibank, joined by Miltreal, filed the present motion for an order dismissing the involuntary petition or, alternatively, "for an order, pursuant to Bankruptcy Code § 362(d), directing that certain funds of the debtor presently held in escrow be paid to Citibank." Ostensibly, the alternate relief requested seeks a lifting of the stay, as provided for by § 362(d) of the Bankruptcy Code, so as to permit Citibank to enforce its judgment lien rights to recover the funds held in escrow.

Citibank argues that inasmuch as the Debtor, prior to the commencement of this case, had represented to Citibank and Miltreal that he would proceed with the settlement subject to the dismissal of the involuntary case, the Debtor should not now be permitted to change his position to the detriment of Citibank and Miltreal.

In response, the Debtor argues that the Citibank lien is a preferential transfer subject to avoidance by the trustee in bankruptcy pursuant to § 547 of the Bankruptcy Code. The Chapter 7 trustee, Gregory Messer, Esq., (the "Trustee") joins the Debtor in the opposition to the motion for dismissal since, in the event the lien is avoided, the sum held in escrow would be available for distribution to creditors of the Debtor.

On August 2, 1992, the IRS filed a proof of claim in this case for income taxes due from the Debtor for the taxable years ending December 31, 1990, and December 31, 1992, in the total amount of $544,616.94. The IRS asserts that it had not initially submitted a claim for said taxes because they arose subsequent to the August, 1990, filing of the involuntary petition. However, the IRS contends that in accordance with § 502(f) of the Bankruptcy Code,[5] such tax claim should be allowed as a priority claim pursuant to § 507(a)(7)(A)(i).[6]

---

5. Section 502(f) of the Bankruptcy Code states:
    In an involuntary case, a claim arising in the ordinary course of the debtor's business or financial affairs after the commencement of the case but before the earlier of the appointment of a trustee and the order for relief shall be determined as of the date such claim arises, and shall be allowed under subsection (a), (b), or (c) of this section or disallowed under subsection (d)

or (e) of this section, the same as if such claim had arisen before the date of the filing of the petition.

6. Section 507(a)(7)(A)(i) of the Bankruptcy Code states:

The IRS states that it was not a party to the negotiations between Citibank, Miltreal and the Debtor, and therefore cannot make any representations with respect to the agreement among them.

## DISCUSSION

Pursuant to § 305(a) of the Bankruptcy Code:

> The court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if—
>
> (1) the interests of creditors and the debtor would be better served by such dismissal or suspension;

■ The dismissal of a case pursuant to § 305(a) of the Code is reviewable by the district court, but not reviewable by the court of appeals or the Supreme Court. 11 U.S.C. § 305(c). It is an extraordinary remedy for which the court must exercise great care by reviewing all of the relevant facts when such a motion is pending. *In re Melp, Ltd.*, 143 B.R. 890, 892 (Bankr. E.D.Mo.1992); *In re Waynes Sport Haus, Ltd.*, 27 B.R. 521, 522 (Bankr.E.D.Mich. 1983). *See also In re Manchester Heights Assocs.*, 140 B.R. 521, 523 (Bankr.W.D.Mo. 1992) (§ 305(a) is an extraordinary power which is to be used only in extraordinary circumstances). As this Court stated in *In re Luftek*, 6 B.R. 539, 548 (Bankr.E.D.N.Y. 1980):

> To be sure, it could be said that dismissal would be in the interests of creditors and the debtor in many of the proceedings commenced under the Bankruptcy Code; this Court could dispose of much of its calendar if its discretion was unbridled. There is an inherent risk to our system of jurisprudence in any Act of Congress which gives the courts such broad powers to refuse jurisdiction over a case.... Indeed, by giving an example of a situation in which abstention or dismissal would be appropriate, Congress had indicated that it intended section 305(a) dismissals to be the exception rather than a rule.

*See In re Iowa Trust*, 135 B.R. 615 (Bankr. N.D.Iowa 1992) (§ 305(a) should be used as the exception rather than the rule).

■ Looking to the legislative history, a case may be dismissed pursuant to this section:

> if an arrangement is being worked out by creditors and the debtor out of court, there is no prejudice to the rights of creditors in that arrangement, and an involuntary case has been commenced by a few recalcitrant creditors to provide a basis for future threats to extract full payment. The less expensive out-of-court workout may better serve the interests in the case.

H.R. 95–595, 95th Cong. 1st Sess. 325 (1977). S.R. No. 95–989, 95th Cong.2d Sess. 36 (1978), U.S.Code Cong. & Admin.News pp. 5787, 6281, 5822 (1978). *See In re Pine Lake Village Apartment Co.*, 16 B.R. 750, 753 (Bankr.S.D.N.Y.1982); *In re Artists' Outlet, Inc.*, 25 B.R. 231, 232 (Bankr.D.Mass.1982).

Some courts rely on a three part test to decide whether or not to dismiss a case pursuant to § 305. The prongs of that test are: (1) the petition was filed by a few recalcitrant creditors and that most creditors oppose the bankruptcy; (2) there is a state insolvency proceeding or an out-of-court arrangement pending; and (3) that dismissal is in the best interest of the debtor and all creditors. *See In re Trina Assocs.*, 128 B.R. 858 (Bankr.E.D.N.Y.1991); *In re Sherwood Enterprises, Inc.*, 112 B.R. 165 (Bankr.S.D.Tex.1989); *In re RAI Marktg. Servs., Inc.*, 20 B.R. 943 (Bankr. D.Kan.1982); *Luftek*, 6 B.R. 539.

---

The following expenses and claims have priority in the following order:

. . . . .

(7) Seventh, allowed unsecured claims of governmental units; only to the extent that such claims are for—

(A) a tax on or measured by income or gross receipts—

(i) for a taxable year ending on or before the date of the filing of the petition for which a return, if required, is last due, including extensions, after three years before the date of the filing of the petition....

■ Although the tests are useful, in determining whether dismissal under § 305(a) is appropriate, courts must look to the facts of the individual cases. *In re Fitzgerald Group*, 38 B.R. 16, 17 (Bankr. S.D.N.Y.1983); *Artists' Outlet*, 25 B.R. at 232. In examining the facts of each case, some courts have considered, in addition to the three-prong test previously referred to, a number of different criteria to determine whether a case should be dismissed under this section including:

(1) economy and efficiency of administration; (2) whether another forum is available to protect the interest of both parties or there is already a pending proceeding in a state court; (3) whether federal proceedings are necessary to reach a just and equitable solution; (4) whether there is an alternative means of achieving the equitable distribution of assets; (5) whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interest in the case; (6) whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process; and (7) the purpose for which bankruptcy jurisdiction has been sought.

*In re Fax Station, Inc.*, 118 B.R. 176, 177 (Bankr.D.R.I.1990).

Applying the three part test to this case, the question first addressed is whether the petition was filed by a few recalcitrant creditors and whether most creditors oppose the bankruptcy.

■ The Trustee is correct when he argues that this case was not commenced by a "few recalcitrant creditors," but by the very creditors who join in the present motion to dismiss. The purpose for which these creditors sought the jurisdiction of this Court was to freeze the rights of the respective parties. When petitioning creditors are "motivated by reasons other than the debtor's insolvency, the court should take a second look at the situation to see if bankruptcy is the best route for all concerned." *Trina Assocs.*, 128 B.R. at 868

(quoting *RAI Marktg. Servs.*, 20 B.R. at 946).

■ Citibank argues that this case should be dismissed since it and Miltreal, the Debtor's largest creditors, oppose the bankruptcy. Many courts consider the support furnished by a majority of creditors to be an important factor in the decision to dismiss involuntary cases pursuant to § 305(a)(1). *Iowa Trust*, 135 B.R. at 623. *See, e.g., In re Rimpull Corp.*, 26 B.R. 267, 272 (Bankr.W.D.Mo.1982) (fact that vast majority of creditors accepted and supported out-of-court arrangement and small minority wanted the bankruptcy were important factors in a "paradigm" case for dismissal); *Artists' Outlet*, 25 B.R. at 234 (as it appeared that a clear majority (in number) of creditors were satisfied with the out-of-court arrangement, the court saw no benefit for retaining jurisdiction); *In re M. Egan Co.*, 24 B.R. 189, 191 (Bankr.W.D.N.Y.1982) (noting as a key factor in its decision to dismiss that most creditors had supported dismissal and only 5% wanted the bankruptcy); *In re Bioline Laboratories, Inc.*, 9 B.R. 1013, 1019–23 (Bankr.E.D.N.Y.1981) (repeatedly noting that majority (60%) of creditors supported dismissal as a key factor in deciding to dismiss); *Luftek*, 6 B.R. at 548 ("acquiescence in alleged debtor's motion [to dismiss] by a substantial body of creditors holding a substantial part of its debt" was key factor in dismissing under § 305(a)(1)). However, the mere fact that Citibank and Miltreal hold the lion's share of the claims is not sufficient to sustain a decision to dismiss this case. Although these creditors hold approximately fifty-five percent of the outstanding debt of the debtor, they are a minority in number as the debtor maintains over one hundred creditors in his schedules, whose claims amount to $6,596,-932.

In addition, while this Court believes that this factor is highly significant in a voluntary case, it is not equally applicable here, in an involuntary case filed by the same creditors that join in the motion and, further, where the moving creditor's lien may

be subject to a voidable preference only in the event the motion is denied.

True, the Petitioners forced the [D]ebtor to walk with them through the door leading to the bankruptcy court; once inside that door, however[,] the Petitioners are limited to equal status with all other creditors of their class. The position of the Petitioners violates the fundamental bankruptcy principle of equality of distribution to creditors of the same class.... It is also conceivable that the Petitioners themselves may ... have received voidable transfers; a dismissal of the case would preclude a determination of that possibility.

*Wayne's Sport Haus*, 27 B.R. at 523.

Citibank and Miltreal argue that their negotiations, transactions and discussions with the Debtor culminated in a settlement. The Debtor, however, disputes that there ever was a settlement agreement between it and the parties, although it admits having engaged in discussions along those lines. The Debtor claims that as a result of pressure from the taxing authorities, he changed his position, decided not to go along with any settlement, as a result of which he consented to the Chapter 7 petition for relief.

■ Citibank and Miltreal argue that the doctrine of equitable estoppel should be applied so as to prevent the Debtor from avoiding the settlement. This Court recognizes the doctrine of equitable estoppel, otherwise known as promissory estoppel. *In re Lafayette Radio Electronics Corp.*, 7 B.R. 189, 193 (Bankr.E.D.N.Y.1980). Equitable estoppel may be invoked only if the following elements are present: (1) conduct which amounts to a false representation, (2) reliance on the conduct of the party to be estopped, and (3) a detrimental change of position based on the conduct. *Walther v. Bank of New York*, 772 F.Supp. 754, 768 (S.D.N.Y.1991); *In re Yachthaven Restaurant, Inc.*, 103 B.R. 68, 77 (Bankr.E.D.N.Y. 1989). The burden of proof is on the party asserting the estoppel. *In re Hunt's Pier Assocs.*, 143 B.R. 36, 45 (Bankr.E.D.Pa. 1992). It is clear that Citibank did not enforce its judgement lien because it assumed that the Debtor would eventually sign a settlement agreement. However, the Debtor's counsel states that throughout the course of the post-petition settlement negotiations, he continually represented to Citibank and Miltreal that "the question of settling versus bankruptcy was a very close question." Zimmerman Aff. ¶ 15. Therefore, Citibank's and Miltreal's reliance was unfounded and misplaced.

■ Additionally, "it is axiomatic that promissory estoppel can only be invoked when a promise has been made. Absent a promise, the doctrine of promissory estoppel is inapplicable." *In re Chateaugay Corp.*, 139 B.R. 598, 605 (Bankr.S.D.N.Y. 1992). Inasmuch as Citibank and Miltreal have failed to demonstrate that a promise to settle was made by the Debtor, the Court will not invoke the doctrine of equitable estoppel.

■ The final test to be considered is whether dismissal is in the best interest of the Debtor and all the creditors.

There is no dispute that dismissing this case is in the best interest of Citibank and Miltreal. However, it is the statutory language of the Bankruptcy Code "which sets the standard and that language requires that the Court must find it would best serve the interests of both the alleged Debtor and the creditors as a whole." *In re Wine & Spirits Specialties of Kansas City, Inc.*, 142 B.R. 345, 347 (Bankr. W.D.Mo.1992). Such a determination must be made on an individual case by case basis. *Iowa Trust*, 135 B.R. at 622; *Trina*, 128 B.R. at 867; *Manchester Heights*, 140 B.R. at 523.

This Court finds that the interests of the Debtor and the creditors, in the entirety, would be better served by the continuance of the bankruptcy case. It appears that Citibank's judgment lien on the Debtor's assets was obtained 89 days prior to the filing of the involuntary petition. Pursuant to § 547(b) of the Code,

the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider....

11 U.S.C. § 547(b). Accordingly, the ultimate distribution to the creditors, other than Citibank and Miltreal, will be significantly greater if this case proceeds in Chapter 7 and Citibank's lien is set aside as a preferential transfer and the sum of $250,000 is recoverable by the Trustee.[7]

The purpose of the preference section is twofold. First, by permitting the trustee to avoid prebankruptcy transfers that occur within a short period before bankruptcy, creditors are discouraged from racing to the courthouse to dismember the debtor during his slide into bankruptcy. The protection thus afforded the debtor often enables him to work his way out of a difficult financial situation through cooperation with all of his creditors. Second, and more important, the preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor. Any creditor that received a greater payment than others of his class is required to disgorge so that all may share equally. The operation of the preference section to deter "the race of diligence" of creditors to dismember the debtor before bankruptcy furthers the second goal of the preference section—that of equality of distribution.

King, *3 Collier on Bankruptcy*, § 547.01 at 547–11 (15th Ed.1992) (citing H.R.Rep. No. 585. 95th Cong., 1st Sess. 177–78).

This Court recognizes that it would be imprudent to suspend a determination of the present motion to dismiss the involuntary petition which requires prompt attention, in favor of the Trustee first instituting an adversary preference action. *In re Kenval Marketing Corp.*, 40 B.R. 445, 449 (Bankr.E.D.Pa.1984). *See also In re GPA Technical Consultants, Inc.*, 106 B.R. 139 (Bankr.S.D.Ohio 1989) (not necessarily in the best interest of creditors and the estate to dismiss case inasmuch as doing so might result in a windfall in favor of those receiving possible preferential transfers).

## CONCLUSION

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and § 157(b) as it is a core proceeding.

2. In light of the foregoing, this Court finds ample reason not to dismiss this case nor to direct that the stay be lifted to permit Citibank to enforce its lien against the funds held in escrow, without prejudice to the rights of the Trustee and Citibank arising out of such adversary proceedings which may be commenced by the Trustee with respect to such funds.

3. The motion of Citibank is denied in its entirety.

SUBMIT AN ORDER CONSISTENT WITH THIS OPINION.